These appeals are from interlocutory orders. We granted permission to appeal pursuant to A.R.App.P. 5(a) because the case turns solely on questions of law. They arise out of a legal malpractice action filed by Dr. O.D. Mitchum against A. Neil Hudgens, the attorney hired by Dr. Mitchum's liability insurance carrier to defend him in a medical malpractice action. The defendant attorney appeals from the denial of his motion for summary judgment. Dr. Mitchum appeals from the denial of his motion to strike and for a protective order. We will first address the trial court's denial of the defendant's motion for summary judgment.
The instant lawsuit is an outgrowth of a medical malpractice action filed in a federal court against Dr. Mitchum by Jay and Carol Scott, the parents of a baby boy that Dr. Mitchum had delivered. The baby was born with numerous birth defects, and the Scotts claimed that the defects were caused by negligent acts and omissions of Dr. Mitchum.
At the time of Dr. Mitchum's care and treatment of Mrs. Scott and the baby, Jeffrey Scott, Dr. Mitchum was covered by a *Page 196 
professional liability insurance policy issued by St. Paul Fire and Marine Insurance Company (hereinafter "St. Paul"). In accordance with the terms of the policy, St. Paul defended Dr. Mitchum and hired the defendant, attorney A. Neil Hudgens, to represent Dr. Mitchum in the Scott case. Just prior to the Scott case going to trial, a settlement agreement was reached wherein St. Paul agreed to pay the Scotts $500,000, which was well within the primary policy's limits.
Dr. Mitchum subsequently filed the present lawsuit against several defendants, including Hudgens and St. Paul. The complaint contains four counts and alleges that Hudgens committed such acts of fraud and negligence during his representation of Mitchum in the Scott case that Mitchum was caused to lose his liability insurance coverage from St. Paul and to lose his ability to obtain medical malpractice insurance for his obstetrical practice from another insurer.[1] Mitchum further alleged that he had suffered damage to his professional reputation and had lost business as a result of not being able to provide obstetrical services. The main contention of Mitchum's complaint against Hudgens is that the settlement of the Scott case was made without his permission or consent and that the settlement of the case, instead of a possible vindication at trial, has damaged him professionally.
 I.
Hudgens moved for summary judgment, which was denied by the trial court. We allowed an interlocutory appeal from the denial, in order to address a controlling question of first impression. Hudgens argues, at he did in the trial court, that, as the attorney hired by St. Paul to represent Mitchum, he owed no duty to Mitchum regarding settlement of the Scott case, because, he argues, under the terms of the contract of insurance between Mitchum and St. Paul, Mitchum's permission or consent was not required for a settlement of any claims brought against him. Hudgens concludes therefore, that nothing he did or did not do could have proximately caused any damage to Mitchum. Dr. Mitchum argues that an attorney has no authority to settle a case on behalf of his client without that client's express consent and that the duty an attorney owes to his client with respect to settlement of a client's case is separate and distinct from any rights or obligations that arise under contract between an insured and his liability insurance carrier. Mitchum also denies that the terms of the policy gave St. Paul the express authority to settle a lawsuit without his consent.
Mitchum's liability insurance policy with St. Paul provided:
 "We'll defend any suit brought against you for damages covered under this agreement. We'll do this even if the suit is groundless or fraudulent. We have the right to investigate, negotiate and settle any suit or claim if we think that's appropriate." (Emphasis added.)
We agree with Hudgens that under this policy provision, St. Paul had the exclusive right to make a settlement of any claim brought against its insured, within the limits of the policy. Most courts construing identical or similar policy provisions have reached the same conclusion. As stated in 7C J. Appleman,Insurance Law and Practice, § 4711 (3d ed. 1983):
 "It was early stated that an insurer has the right to make a compromise or settlement of any claims against the insured, and that it is not bound to consult the interests of the insured to its own prejudice. The law favors settlement without recourse to litigation.
 "Liability insurance contracts have been held to give the insurer the absolute authority to settle claims within the policy limits, and the insured has no power either to compel the insurer to make such settlements, or to prevent it from doing so."
(Emphasis added.) Hence, Dr. Mitchum's consent was not required before his insurer, St. Paul, could settle the malpractice *Page 197 
claim brought against him by the Scotts. See, United StatesFidelity Guaranty Co. v. Sanders Drilling Workover Co.,396 So.2d 1353 (La.Ct.App. 1981) (by terms of liability policy, consent of insured not required prior to making settlement of claim); Travelers Ins. Co. v. Hitchner, 61 N.J. Super. 283,160 A.2d 521 (1960) (insurer may at its option settle claims against insured for loss or injury covered by policy without any interference on the part of the insured). See also,Casualty Ins. Co. v. Town Country Pre-School Nursery, Inc.,147 Ill. App.3d 567, 101 Ill.Dec. 669, 498 N.E.2d 1177 (1986). This is not to say, however, that the insurer is entitled to exercise this right arbitrarily. "The right given by contract still requires that the insurer make an investigation, consider the desires or instructions of the insured and that the settlement not be made in bad faith." 7C J. Appleman, InsuranceLaw and Practice, § 4711 (3d ed. 1983). As stated inWaters v. American Cas. Co. of Reading, Pa., 261 Ala. 252,260-61, 73 So.2d 524, 531 (1953), "[T]he contract of insurance gives the insurer the exclusive right to make a settlement of the claim against [the] insured. That right imposes a corresponding duty raised by law to observe ordinary diligence in performing that power when in exercise of it."
Contrary to Dr. Mitchum's position, we do not believe that the quoted policy provision has been taken out of context, nor do we believe that the construction we have placed on it defeats the intention of the parties. That provision is clear and unambiguous and is contained in every standard liability insurance policy. See, 1 R. Long, The Law of LiabilityInsurance, § 5.02 (1981). Having determined that such a policy provision grants the insurer the exclusive right to settle any claim against its insured without the insured's consent, we must next determine what effect this determination has on the attorney-client relationship within the context of the present case.
The defendant attorney maintains that, based on this court's prior decision in Waters, supra, he owed no duty to Dr. Mitchum with regard to settlement of the Scott case. He also argues that the policy provision granting the insurer the exclusive right to settle any claim against its insured is a complete bar to Dr. Mitchum's cause of action. Dr. Mitchum's position is that, regardless of the terms of his insurance contract with St. Paul, defendant Hudgens, as his attorney, was under a duty not to settle the Scott case without his express permission to do so.
Waters v. American Cas. Co. of Reading, Pa., 261 Ala. 252,73 So.2d 524 (1953), involved an action by an insured against his liability insurer for the insurer's alleged negligent failure or bad faith refusal to settle claims against the insured within policy limits. On rehearing, the Court stated:
 "We have been urged to extend the opinion in this cause as to the application of the rules of negligence and bad faith and as to the effect of the opinion upon the liability of attorneys representing the insured upon appointment by the insurer. We first consider negligence and bad faith in cases of this nature.
 "There is a field of operation for both aspects of liability: that is, negligence in one, and bad faith in the other. We cannot set aside the principle of liability for negligently performing a contract as set forth in the opinion supra. It may arise when an insurer is engaged in performing his contractual duty owing to the insured to defend the suit. The law raises a duty not contractual, but by reason of the contract, to exercise ordinary diligence in doing so. A failure to exercise ordinary diligence proximately causing damage to the insured is actionable in tort. The contract of insurance gives the insurer the exclusive right to make a settlement of the claim against [the] insured. That right imposes a corresponding duty raised by law to observe ordinary diligence in performing that power, when in the exercise of it. So that, when an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability, the law raises a duty on his part to use ordinary care to ascertain the facts on which its performance depends if he has not already done so. If *Page 198 
the insurer neglects to exercise ordinary diligence in ascertaining these facts, if he has not already done so, and as a proximate result of such neglect he fails to make such a settlement, which is available, and when such knowledge would have caused a reasonably prudent person to do so, and a verdict and judgment are rendered against [the] insured in an amount more than the limit of liability in the policy, the insurer should be held liable to the insured for the full amount of the judgment.
 "If the insurer has already made the investigation and ascertained the facts, to which we have referred supra, and refuses to make such proffered settlement, if such refusal is due to the honest judgment of [the] insurer that the facts do not warrant such a settlement, and the insurer was not negligent in the manner of defending the suit, he would not be liable to [the] insured for an amount in excess of the limit of liability provided in the policy, although the verdict and judgment were in excess of it. But if such refusal to settle under those circumstances is the proximate result of bad faith on the part of the insurer, he would be liable for the full amount of the judgment, notwithstanding it is in excess of the limit fixed in the policy.
 "We have been speaking of the duty and liability of the insurer and not of his attorney. Of course the attorney must exercise ordinary diligence and skill throughout. That imposes a duty on him to inform the insurer of a proposal of the plaintiff to settle within the limit of the liability.
Whether or not he does so in fact, the insurer is charged with the notice to him which he received in the course of his employment the same as if he has in fact so notified the insurer. [citations omitted] The attorney owes no duty to the insured in that connection. If he fails to notify the insurer as his employer, the issue is between them alone, for as to the insured the status is as though the attorney had so notified the insurer."
261 Ala. at 260-61, 73 So.2d at 531-32.(Emphasis added.) While we recognize that Waters involved a claim concerning failure to settle, we conclude that, based on Waters, defendant Hudgens was under no legal duty to communicate to Dr. Mitchum any settlement offers from the Scotts, as the contract of insurance gave St. Paul the exclusive right to make a settlement of the claim against Dr. Mitchum. Defendant Hudgens submits that it follows that he was under no legal duty to obtain Dr. Mitchum's consent prior to settling the Scott case at the direction of St. Paul. We agree. However, this conclusion should not be construed as disparaging the attorney-client relationship.
When an insurance company retains an attorney to defend an action against an insured, the attorney represents the insured as well as the insurance company in furthering the interests of each. The nature of this "tripartite relationship" has been characterized as follows:
 "In the insured-insurer relationship, the attorney characteristically is engaged and paid by the carrier to defend the insured. The insured and the insurer have certain obligations each to the other, as previously noted, arising from the insurance contract. Both the insured and the carrier have a common interest in defeating or settling the third party's claim. If the matter reaches litigation, the attorney appears of record for the insured and at all times represents him in terms measured by the extent of his employment.
 "In such a situation, the attorney has two clients whose primary, overlapping and common interest is the speedy and successful resolution of the claim and litigation. Conceptually, each member of the trio, attorney, client-insured, and client-insurer has corresponding rights and obligations founded largely on contract, and as to the attorney, by the Rules of Professional Conduct as well. The three parties may be viewed as a loose partnership, coalition or alliance directed toward a common goal, sharing a common purpose which lasts during the pendency of the claim or litigation against the insured." *Page 199 
American Mut. Liability Ins. Co. v. Superior Court forSacramento County, 38 Cal.App.3d 579, 591-92, 113 Cal.Rptr. 561,571 (1974). It must be emphasized that the relationship between the insured and attorney is that of attorney and client. That relationship is the same as if the attorney were hired and paid directly by the insured and therefore it imposes upon the attorney the same professional responsibilities that would exist had the attorney been personally retained by the insured. These responsibilities include ethical and fiduciary obligations as well as maintaining the appropriate standard of care in defending the action against the insured.
In the usual case, an attorney cannot settle a client's case without the client's consent. In Daniel v. Scott, 455 so.2d 30 (Ala.Civ.App. 1984), the Court of Civil Appeals summarized the law in Alabama with respect to the power of an attorney to settle or compromise a client's cause or defense, as follows:
 "An attorney cannot settle a client's action or claim or prejudice a client's rights without authorization from the client. Davis v. Black, 406 So.2d 408 (Ala.Civ.App. 1981); Nero v. Material Sales Company, Inc., 340 So.2d 454 (Ala.Civ.App. 1976). The power to compromise a demand does not arise from the power to sue or from an attorney's general authority which is usually limited in both duty and authority to the vigilant prosecution or defense of the rights of the client. The authority to settle is not incidental, but it is essential that an attorney have express, special authority from his client to do so. Birmingham Electric Company v. Cochran, 242 Ala. 673, 8 So.2d 171
(1942); National Bread Company v. Bird, 226 Ala. 40, 145 So. 462 (1933); Senn v. Joseph, 106 Ala. 454, 17 So. 543 (1895); Robinson v. Murphy, 69 Ala. 543
(1881). A person dealing with an attorney must ascertain the extent of the attorney's authority to compromise the client's claim. Life and Casualty Insurance Company v. Bell, 235 Ala. 548, 180 So. 573 (1938); Robinson v. Murphy, supra. 'An attorney employed to represent a litigant in the prosecution or defense of a suit is a special agent of his client and has no implied or inherent authority or right to compromise and settle it.' (Citations omitted.) Crawford v. Tucker, 258 Ala. 658, 663, 64 So.2d 411, 416 (1953). An agent's apparent authority must be founded upon the conduct of the principal and not upon the conduct of the agent. Northington v. Dairyland Insurance Company, 445 So.2d 283 (Ala. 1984)."
455 So.2d at p. 32-33.
While Hudgens conceded at oral argument that he owed numerous duties to Dr. Mitchum, he maintains that Dr. Mitchum contracted away the specific right not to have a claim brought against him settled without his consent. Dr. Mitchum relies heavily onRogers v. Robson, Masters, Ryan, Brumund Belom, 74 Ill. App.3d 467, 30 Ill.Dec. 320, 392 N.E.2d 1365 (1979), affirmed,81 Ill.2d 201, 40 Ill.Dec. 816, 407 N.E.2d 47 (1980), for the proposition that the insurance policy and its provisions do not negate the duties an attorney owes his client. The facts inRogers are virtually identical to the facts in the present case. There, a physician sued the attorneys hired by his malpractice insurance carrier to defend him in a malpractice action; he sued the attorneys for settling the malpractice claim without his consent. The attorneys set up the insurance policy, which granted the insurer the right to settle the case without the physician's consent, as a defense. The court stated:
 "Some of the duties of an attorney to the insured originate with the basic principle embodied in Canon 5 of the Code of Professional Responsibility of the American Bar Association (Am.Jur.2d Desk Book, Doc. No. 91.1 (1978 Supp.) which provides:
 " 'A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client.'
". . .
 "Ordinarily, since the interests of insurer and insured are harmonious, there is no conflict and the attorney is able to exercise independent judgment for both clients. Therefore, in the usual instance, *Page 200 
there is nothing improper or unethical about representing the interests of both. (See Keeton, Ancillary Rights of the Insured Against His Liability Insurer, 28 Ins. Counsel J. 395, 413 (1961).) However, situations can arise where those interests may become conflicting. (See generally, Guiding Principles of the National Conference of Lawyers and Liability Insurers, Am.Jur.2d Desk Book, Doc. No. 91.4 (1978 Supp.), approved by the American Bar Association, February 7, 1972). As is recognized in EC 5-17 of the Code of Professional Responsibility of the American Bar Association:
 " 'Typically recurring situations involving differing interests are those in which a lawyer is asked to represent . . . an insured and his insurer. . . . Whether a lawyer can fairly and adequately protect the interests of multiple clients in these and similar situations depends upon an analysis of each case. In certain circumstances, there may exist little chance of the judgment of the lawyer being adversely affected by the slight possibility that the interests will become actually differing; in other circumstances, the chances of adverse effect upon his judgment is not unlikely.'
 "When a conflict does arise, serious ethical considerations prohibit an attorney from continuing to represent both the interests of the insured and the insurer. (See DR 5-107(C) of the Illinois Code of Professional Responsibility.) However, the attorney does not necessarily have to withdraw from the case. In many situations, if, after full and frank disclosure, the clients are willing to consent to the attorney's continued representation on their behalf, ethical considerations are satisfied and the attorney may continue to represent the conflicting interests. Maryland Casualty Co. v. Peppers, 64 Ill.2d 187, 355 N.E.2d 24 [1976].
 "What facts must be revealed depends on the circumstances. When an attorney represents two clients with divergent or conflicting interests in the same subject matter, the attorney must disclose all facts and circumstances which in the judgment of a lawyer of ordinary skill and capacity, are necessary to enable his client to make a free and intelligent decision regarding the representation. Lysick v. Walcom, 258 Cal.App.2d 136, 65 Cal.Rptr. 406, 28 A.L.R.3d 368.
 "While the foregoing discussion has focused on the risks of conflict inherent in dual representation, the principle to be gleaned is that the attorney does represent the insured and assumes all of the duties imposed by the attorney-client relationship. Not only does the attorney owe his client fidelity and loyalty, but also [he] is required to exercise reasonable skill in the performance of his duties.
 "Any attorney-client relationship includes the duty for the attorney to advise the client of progress in a case or controversy and this duty is not altered by the presence of a third-party insurer whom the lawyer also represents. An insured must be informed of any settlement offers that affect him so that the insured may take proper steps to protect his own interests. Ivy v. Pacific Auto. Ins. Co., 156 Cal.App.2d 652, 320 P.2d 140. See Mallen, Insurance Counsel: The Fine Line Between Professional Responsibility and Malpractice, 45 Ins. Counsel J. 244, Sec. 17 (1978).
". . .
 "Apart from any considerations arising from the insurance policy, we believe that when defendant became aware that a settlement was imminent because of the preferences of the insurance company, and that their other client, the plaintiff, did not want the case settled, a conflict arose and defendant could not continue to represent both without a full and frank disclosure of the circumstances to its clients. Furthermore, the general duties of the defendant in representing plaintiff were strengthened by the defendant agreeing, if it did, to defend the case rather than settle. Having continued representing both the insurer and insured without the requisite disclosure, defendant breached its duty to plaintiff. *Page 201 
When an attorney attempts dual relationships without making full and frank disclosure required of him, he is liable to the client who suffers loss caused by the lack of disclosure. Lysick v. Walcom, 258 Cal.App.2d 136, 65 Cal.Rptr. 406, 28 A.L.R.3d 368.
 "By failing to inform plaintiff of the proposed settlement, defendant foreclosed plaintiff from alternatives that were available to him. Plaintiff could have consented to continued representation by the defendant at the expense of the insurance company with the accompanying likelihood that the case would be settled without his consent, for, as we have held, the insurance company by virtue of the contract could settle without plaintiff's consent. If plaintiff believed such a course of action was not in his best interests, he could release the insurance company from its obligation under the policy, select different counsel, defend the action at his own expense and bear the risk of an adverse decision.
 "Having failed to provide plaintiff with the proper disclosure of the facts and then obtaining plaintiff's consent to continued representation, defendant breached a duty which, if damages and proximate cause are established, will make defendant liable to plaintiff for the loss caused by the lack of disclosure. We believe the trial court erred in holding for defendant on its motion for summary judgment."
74 Ill.App.3d at 472-475, 30 Ill.Dec. at 326-27,392 N.E.2d at 1371-72. Although we agree with the general principles enunciated by the court in Rogers, we do not share that court's conclusion that a conflict arose when the insured informed his defense counsel that he did not want the case settled. Contrary to that court's holding, we believe that the insurance contract does affect the attorney-client relationship with respect to settlement of an action brought against an insured. If the insured has contracted away the right to require his consent prior to a settlement of a claim against him, no real conflict of interest exists between the insured and the insurer, at least where the claim or settlement is within policy limits and there has been no reservation of rights by the insurer.
In L S Roofing Supply Co. v. St. Paul Fire Marine Ins.Co., 521 So.2d 1298 (Ala. 1987), we enumerated the duties owed by an insurer and appointed counsel where the insurer is defending its insured under a reservation of rights. With respect to appointed counsel, we stated:
 " 'In addition to the above specific criteria to be met by the company, defense counsel retained by insurers to defend insureds under a reservation of rights must meet distinct criteria as well. First, it is evident that such attorneys owe a duty of loyalty to their clients. Rules of Professional Conduct 5.4(c) prohibits a lawyer, employed by a party to represent a third party, from allowing the employer to influence his or her professional judgment. In a reservation-of-rights defense, RPC 5.4(c) demand[s] that counsel understand that he or she represents only the insured, not the company.
As stated by the court in Van Dyke v. White, 55 Wn.2d 601, 613, 349 P.2d 430 (1960), "[t]he standards of the legal profession require undeviating fidelity of the lawyer to his client. No exceptions can be tolerated." [See EC 5-14, EC 5-15, and DR 5-105, Code of Professional Responsibility of the Alabama State Bar.]
 " 'Second, defense counsel owes a duty of full and ongoing disclosure to the insured. This duty of disclosure has three aspects. First, potential conflicts of interest between insurer and insured must be fully disclosed and resolved in favor of the insured. . . . Second, all information relevant to the insured's defense, including a realistic and periodic assessment of the insured's chances to win or lose the pending lawsuit, must be communicated to the insured. Finally, all offers of settlement must be disclosed to the insured as those offers are presented. In a reservation-of-rights defense, it is the insured who may pay any judgment or settlement. Therefore, it is the insured who must make the ultimate choice regarding settlement. *Page 202 
In order to make an informed decision in this regard, the insured must be fully apprised of all activity involving settlement, whether the settlement offers or rejections come from the injured party or the insurance company.' "
521 So.2d at 1303, quoting Tank v. State Farm Fire CasualtyCo., 105 Wn.2d 381, 715 P.2d 1133 (1986). The rationale behind the requirement that the insured have control over acceptance or rejection of settlement offers in a reservation-of-rights situation is that the insured has a direct financial stake in the litigation. In the present case, Dr. Mitchum had no direct financial stake in the litigation, as there was no reservation of rights by St. Paul and the Scotts' original claim, as well as their settlement offers, were within the limits of available insurance coverage, and there was no deductible. This is not to say that appointed counsel is under no ethical duty to make a full disclosure of the progress of the litigation to the insured. Certainly, appointed counsel should keep his client, the insured, apprised of all developments in the case, including settlement negotiations. Appointed counsel should also inform the insured of the reasons why he believes settlement is the best course of action. But merely failing to so inform the insured within the context of the present case would not give rise to a cause of action for money damages in favor of the insured. See Terry Cove North,Inc. v. Marr Friedlander, P.C., 521 So.2d 22 (Ala. 1988). We hold that if the insured objects to a settlement of a claim, the attorney is not thereby precluded from negotiating a settlement at the direction of the insurer where the insurer has, by the terms of the policy, the exclusive right to settle or compromise claims against its insured. We hold further that an attorney who does so cannot be held liable to the insured for legal malpractice for failing to obtain the consent of the insured to settle the claim, because the insured, by contracting away the right to require such consent, has thereby impliedly consented to the settlement of claims against him, within policy limits, by appointed counsel at the direction of the insurer. It is for this very reason that Hudgens could not have proximately caused any of the damage Dr. Mitchum has alleged that he suffered as a result of the settlement of the Scott suit without his consent.
The court in Rogers reasoned that by failing to inform the plaintiff of the proposed settlement, the defendant foreclosed the plaintiff from alternatives that were available to him. The court specifically stated that the plaintiff could have released the insurance company from its obligations under the policy, selected different counsel, and defended the action at his own expense and risk. In the present case, the defendant Hudgens did not foreclose any alternative available to Dr. Mitchum by settling the Scott case without Dr. Mitchum's express consent. By statute, Dr. Mitchum could not have released St. Paul from its obligations to defend and indemnify him. See Alabama Code 1975, § 27-23-1.
Finally, Dr. Mitchum argues that even if his liability policy is construed to grant his insurer the right to settle a claim without his consent, then the insurer is nonetheless obliged to handle his case in good faith. Although we agree with the statement of this general principle, it is not necessary to explore its parameters, as that principle relates to the duties of the insurer and not appointed counsel.
Dr. Mitchum's complaint contains numerous allegations of fraud and negligence; all of these allegations are made against all the defendants, without distinction. It is apparent that most of these allegations are directed toward Dr. Mitchum's insurer, St. Paul. In the present case, we conclude that Hudgens cannot be held liable on those claims grounded on his alleged failure to advise Dr. Mitchum of the Scott settlement and to obtain his consent to that settlement, whether such allegations are grounded in fraud, negligence, or wantonness. The motion for summary judgment, insofar as it related to those claims, should have been granted; the order denying summary judgment on those claims is reversed.
 II.
The original medical malpractice case against Dr. Mitchum was scheduled *Page 203 
for trial in a federal court. Two pretrial conferences were held. After the second pretrial conference, the trial judge issued a pretrial order. That order summarized the contentions of the parties. The order omitted the contention of the Scotts, which was contained in the court's first pretrial order, that Dr. Mitchum was negligent in the resuscitation of the Scott infant. Instead, the sole contention of the Scotts was stated as being that the infant was injured "as a result of the negligent failure of the Defendant, Dr. O.D. Mitchum, to properly monitor the Plaintiff's labor and to perform a timely cesarean section."
In the instant case, Hudgens seeks to defend Dr. Mitchum's action on several grounds, including the ground that Dr. Mitchum was guilty of medical malpractice, and hence, that Hudgens properly handled the defense of the Scott suit and that the settlement of the case for $500,000 was justified. Hudgens also intends to call several expert witnesses who were not listed as experts to be used in the Scott case. In response, Dr. Mitchum filed a motion to strike and in that motion also sought a protective order, requesting the trial court to exclude the resuscitation issue and to limit the malpractice issue to that stated in the second pretrial order in the Scott case — failure to timely perform a cesarean section. Dr. Mitchum also sought to exclude certain expert witnesses that Hudgens intended to call. The trial court denied the motion. We granted an interlocutory appeal pursuant to Rule 5(a), A.R.A.P.
Dr. Mitchum argues that because the trial court's second pretrial order in the Scott case summarized the Scotts' contentions as going only to the negligent failure to timely perform a cesarean section, that was the only triable issue in the Scott case and therefore Hudgens should be precluded from raising the issue of negligent resuscitation in the present case. Hudgens disputes the argument that resuscitation was not a triable issue in the Scott case, and argues that the pretrial order encompassed the Scotts' pleadings, which were broad enough to include the resuscitation issue.
Although the parties have not argued the applicability of Rule 16 of the Federal Rules of Civil Procedure ("Pretrial Conferences; Scheduling; Management"), we believe that procedural rule is dispositive of the issue. Cf. Rule 16, Ala.R.Civ.P. Rule 16(e) provides:
 "(e) PRETRIAL ORDERS. After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." (Emphasis added.)
As pointed out in 3 J. Moore, Moore's Federal Practice§ 16.19:
 "While Rule 16 does not in terms provide that the pretrial order supersedes the pleadings . . . nevertheless in practice the order sometimes has that effect." (Footnotes omitted.)
While a pretrial order can have the effect of precluding issues raised in the pleadings, in the present case the pretrial order includes the Scotts' complaint. The order states:
 "This cause coming to be heard on a regular pretrial hearing on the 30th day of March, 1984, and all parties being present in person or by counsel, the following action was thereupon taken:
 "1. The following pleadings and amendments were allowed: Plaintiffs' Complaint; the answers of Defendants."
The Scotts' original complaint against the plaintiff doctor consists of three causes of action. The relevant language of each cause of action is set forth below:
"FIRST CAUSE OF ACTION
". . .
 "6. Said Defendants were negligent in and about the care and treatment of Carol Scott during the course of her labor and delivery."
"SECOND CAUSE OF ACTION"
". . . *Page 204 
 "2. Said Defendants impliedly contracted with the Plaintiffs to provide reasonably adequate and competent medical care and treatment during the course of Carol Scott's labor and delivery.
 "3. The Defendants breached said implied contract by failing to provide reasonably adequate and competent medical care during said period."
THIRD CAUSE OF ACTION
 "Realleges and reavers the above allegations on behalf of Jay Scott, the father of Jeffrey." (Emphasis added.)
Although we agree with Dr. Mitchum that, as a general proposition, in an action against an attorney for legal malpractice the issues and evidence should be limited to those issues and evidence presented or proposed to be presented at the underlying trial, based on these allegations we are unable to conclude that the issue of the resuscitation of the Scott infant was not a triable issue in the Scott case. In addition, it is apparent that Dr. Mitchum has expanded the present case beyond the "trial within a trial" because of various items of damages he claims were caused by the actions of Hudgens.
Dr. Mitchum claims that he suffered damages because St. Paul cancelled his obstetrical coverage and he can no longer obtain such insurance. Hudgens maintains, and we are constrained to agree, that evidence as to Dr. Mitchum's skills, training, and abilities, or the lack thereof, in the obstetrical area, including resuscitation, are relevant to the issues of whether Hudgens's actions led to Dr. Mitchum's inability to get coverage or whether it was Dr. Mitchum's own conduct that caused him to lose coverage. For the same reason, the potential testimony of the expert witnesses sought to be excluded by Dr. Mitchum is also relevant to the issues of causation and damages, as well as to the issue of why a settlement of the Scott case was favored.[2] These witnesses are physicians who were consulted by Hudgens during the pendency of the Scott case. According to Hudgens, these physicians were critical of Dr. Mitchum's care and treatment of Mrs. Scott and her newborn. As Hudgens points out, the opinions of these doctors were pertinent to the handling of the defense of the Scott suit, and obviously the defense would not have listed them as experts to be called in the trial of the Scott suit. Their testimony would clearly be relevant to the issues of causation and damages raised by Dr. Mitchum in his complaint.
Based on the foregoing, we conclude that the trial court did not err in denying Dr. Mitchum's motion to strike and for a protective order.
86-1466 AFFIRMED.
86-1467 REVERSED AND REMANDED.
MADDOX, SHORES and ADAMS, JJ., concur.
[1] As we read the complaint, count four, which alleges breach of contract, applies only against St. Paul, which was also a defendant in the present lawsuit.
[2] As pointed out in the first part of this opinion, Dr. Mitchum has no cause of action against Hudgens for settling the Scott suit without Dr. Mitchum's consent.